

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **STATE OF MISSOURI EX REL SHERIFF PAUL VESCOVO, III,** | **WD83130** |
| **Appellant-Respondent,** | **CONSOL. WITH:** **WD83172 and WD83196** |
| **v.** | |
| **CLAY COUNTY, MISSOURI, ET AL.,** | **OPINION FILED:** |
| **Respondents-Appellants.** | **DECEMBER 5, 2019** |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Daren Lee Adkins, Judge**

**Before Special Division: Alok Ahuja, Presiding Judge, Gary D. Witt, Judge,**
**Anthony Rex Gabbert, Judge**

### INTRODUCTION

In this consolidated appeal, we consider the cross-appeals of Appellant-Respondent

Sheriff Paul Vescovo, III and Respondent-Appellants Clay County, Missouri and Clay County,

Missouri Commissioners Gene Owen and Luann Ridgeway (the "County"). Respondent Jerry

Nolte, also a Clay County, Missouri Commissioner, appeared as a defendant below and appears

before us now solely as a respondent.[1] This appeal arises from an action before the Circuit Court

---

[1]     All three members of the Clay County Commission were named as defendants in the Sheriff's lawsuit, in their official capacities. Commissioner Nolte appeared through separate counsel from the County and the other Commissioners, and participated extensively in proceedings both here and in the circuit court. Commissioner Nolte took a position largely aligned with the Sheriff, and contrary to the position of the majority of the Commission of

of Clay County, Missouri where Sheriff Vescovo sought a writ of mandamus, declaratory relief, and attorney's fees. Sheriff Vescovo raises one point on appeal, claiming the circuit court erred in not awarding him attorney's fees. The County raises one point on appeal, claiming the circuit court erred in issuing its writ of mandamus. We affirm the issuance of the writ of mandamus, reverse the denial of attorney's fees by the trial court but deny the Sheriff's motion for attorney's fees for the appeal, and remand for further proceedings.

## BACKGROUND

The facts, in the light most favorable to the judgment, are as follows. Sheriff Vescovo is the duly elected Sheriff of Clay County, Missouri. Clay County, Missouri, a first class county under state law, is a political subdivision of the State of Missouri. The Clay County Commission is the governing authority of Clay County, and it is comprised of three elected commissioners: Jerry Nolte, Luanne Ridgeway, and Gene Owen. Commissioners Nolte, Ridgeway, and Owen were sued in their official capacities. Laurene Portwood, who is not a party to this appeal but figures prominently in the relevant events, is both the Chief Budget Officer of Clay County and the Assistant County Administrator.

Sheriff Vescovo has many legal duties, largely prescribed by statute, which include the duty to be the "jailer" for Clay County. As jailer, he is responsible for the custody and humane care of all inmates and prisoners. He is also charged with keeping the peace, patrolling and policing county roads and highways, committing offenders to jail, enforcing public safety laws,

___

which he is a member. We have serious reservations whether a single legislator, who took a minority position on a challenged legislative action, and who is sued solely in his or her official capacity, has standing to litigate his or her minority position, independently from and in opposition to the legislative body of which the legislator is a part. We need not ultimately resolve that issue here, however, since we have no similar concerns regarding the Sheriff's standing, and Commissioner Nolte raises no new issues not already presented by the Sheriff. Additionally, none of the parties objected to his participation in this litigation or raised arguments challenging his standing.

2

providing courthouse security, and serving process. Although he is a separately elected official, and he presides over a separate office and department, his budget is explicitly set and controlled by the Clay County Commission, pursuant to state law.

As part of the budgeting process, Sheriff Vescovo's office, along with other county departments, presents a proposed department budget to the County's Chief Budget Officer, Laurene Portwood. Portwood then compiles and presents the various proposed budgets to the Commissioners as a proposed budget for the county as a whole, making adjustments as deemed necessary in light of the needs of the County. The Sheriff's budget includes an operating budget, which is separate from the budget used to pay personnel. The Sheriff's operating budget for the years 2016 and 2017 was approximately $2.5 million. His operating budget in 2018, which was cut for reasons discussed below, was $2.1 million. In 2019, he requested $3.1 million. This proposed operating budget was based on estimated expenditures calculated in part from historical information regarding prior years' actual expenditures. Throughout these years, the County's revenues increased each year.

A sizable portion of the Sheriff's proposed operating budget for 2019 was for operation of the county jail, including monies to fulfill contractual obligations with vendors providing inmate food, healthcare, and other commodities. The contracts establish term and supply pricing and estimates of the expenditures the County should expect to make under the contracts. The contract for inmate food sets forth a per meal price. The healthcare contract includes fixed fees for onsite medical personnel. As required by state law, vendor contracts were entered into and approved by the Commission. Chief Budget Officer Portwood, pursuant to authority granted to her by the Commission, personally signs many of the County's contracts, including the contract

3

for inmate food. Sheriff Vescovo possesses no authority to enter into contracts on behalf of the County or his department.

During the 2019 budgeting process, Sheriff Vescovo presented his proposed operating budget to Chief Budget Officer Portwood in late-July, 2018. In August of 2018, representatives of the Sheriff's office met with Portwood to discuss the proposed budget and address any concerns. When she compiled and made her proposed budget for the County available for departments to review in November of 2018, Portwood had unilaterally reduced the Sheriff's proposed operating budget, including by significantly reducing portions of the budget dealing with vendor contracts for operation of the jail including for inmate food and healthcare. In addition to reducing Sheriff Vescovo's operating budget, Portwood also reorganized his budget into five line-items or "silos", a change from how his budget was organized in previous years. These silos included Field Operations, Civil Process & Court Security, Detention, Administration, and 911 Emergency Management. In reducing his proposed budget, Portwood did not contact Sheriff Vescovo directly to provide notice of her reductions or give his office any opportunity to discuss the proposed reductions with her or with the Commission.[2] Sheriff Vescovo's office first learned of the reductions when the 2019 County Proposed Budget was posted online for officeholders to review.

Sheriff Vescovo's own budget officer, Captain Siercks, emailed Portwood on December 5, 2018 to express his concerns that the 2019 budget did not sufficiently fund, among other

---

[2] The County Budget Law, Mo. Rev. Stat. §§ 50.525 – 50.745 (2016), sets forth detailed procedures regarding how county budgets are to be adopted. Section 50.540.5(1) states that in class one counties, if the budget officer recommends "any decrease or reduction" in a department's proposed budget, the budget officer "shall give special notice to the officer or agency of the decrease or reduction and the officer or agency is entitled to be heard thereon by the county commission."

4

things, the operation of the jail. Portwood responded with the recommendation that the Sheriff "be prepared to discuss with the Commission where other funds may be reallocated within law enforcement funds." Sheriff Vescovo followed up with a letter on December 6, 2018, which again stated that the 2019 budget was grossly insufficient to fund the jail's biggest expenses: inmate food and healthcare. Commissioner Ridgeway was also emailed by Sheriff Vescovo's office and given notice that the 2019 budget did not adequately fund the contracts for inmate food and healthcare. Neither Sheriff Vescovo's letter nor the email to Commissioner Ridgeway received responses.

On January 28, 2019, consistent with the Budget Officer's recommendations, the Commission adopted a 2019 Operating Budget giving the Sheriff $1,788,829, over $1.3 million less than the $3,177,273 he requested.[3] Commissioners Owen and Ridgeway voted in favor of the budget. Commissioner Nolte voted against the budget. The appropriations ordinance approving the budget also adopted line items, similar to the silos present in Portwood's proposed budget, and it contained the following language: "Limits on Expenditure Authority. Each Expenditure Authority is not authorized to expend sums in excess of the amounts of each expense line item shown in 2019 – ORD-01 for that particular purpose and object." This language prevented the Sheriff from moving funds between expense line items in his budget. This prohibited him from transferring funds to address critical shortfalls in the areas of inmate food and healthcare. The adopted budget left a budget shortage of $755,152 for inmate food and

---

[3] This was over $700,000 less than the Commission budgeted for his office in 2016 and 2017 and over $300,000 less than the Commission budgeted for his office in 2018.

5

healthcare, roughly 60% less than required to satisfy the historical amounts necessary to cover these vendor contracts.[4]

Sheriff Vescovo filed a Petition for Writ of Mandamus, Declaratory Judgment, and Attorney's Fees in the Clay County Circuit Court on April 19, 2019. He requested both a preliminary and permanent writ ordering the County to provide an additional $1,754,307 to allow his department to cover various contractual obligations, including payments to vendors for inmate food and healthcare. His second claim requested a declaratory judgment that the under-funding of his office in 2018 was illegal and damaging to his office, and restitution of the reduced amounts and attorney's fees. His third claim requested reimbursement of his attorney's fees.

A hearing was held on June 10, 2019 where the parties argued a motion to dismiss filed by the County and the Sheriff's request for a preliminary writ. At the hearing, the County argued that the Sheriff had not exhausted all administrative remedies prior to filing suit, namely, he had failed to properly bring the matter before the Commission with a request that they amend his budget. The court declined to enter the preliminary writ, noting that the vendor contracts for the jail were not yet in arrears and that the Sheriff still had alternative remedies available to him as suggested by the County. Nonetheless, the motion to dismiss was denied, the matter was set for a bench trial beginning in August, and discovery commenced on an expedited schedule.

In light of the County's defense that the Sheriff had not brought the matter before the Commission, a request was promptly made. On June 14, 2019, the Sheriff's office informed the Commission that because his budget for the jail was inadequately funded, additional funds were

---

[4] While the number of inmates confined in the jail on any given day can vary, the overall jail population has remained fairly consistent over the relevant period of time.

6

needed to satisfy vendor contracts for inmate food and healthcare. He requested that the matter be placed on the agenda for the next County Commission meeting, and he included a request for official action transferring $755,152 from the County's general fund to the Sheriff's fund for the purpose of paying vendor contracts. Portwood responded with an email stating that "[p]er counsel's advice, matters pertaining to pending litigation should not be placed before the commission." The Commission has granted to Portwood the authority to place items or refuse to place items on its agenda.

A bench trial commenced on August 7, 2019. The parties first presented arguments regarding a motion for sanctions filed by Commissioner Nolte against the County. The Sheriff requested that the County produce emails and various other communications regarding the Sheriff's budget, with an apparent agreement that the County would comply with such request prior to the first deposition of the County's official representative, Portwood. Commissioner Nolte claimed that all of nine emails were produced prior to that first deposition. At the deposition, it was revealed that over 8,000 potentially relevant emails had come up in searches of the County's email server. After the first deposition, and before a second deposition was conducted, an additional 8,390 emails were produced. Counsel's review of the 8,390 emails revealed that some emails had been sent to or from personal email addresses. There were personal email addresses for Commissioner Ridgeway and Portwood, as well as members of Portwood's staff. Searches for personal email addresses appearing within the 8,390 produced emails suggested there were hundreds of emails sent to and from personal email accounts addressing the Sheriff's budget which were not produced by the County.

At Portwood's second deposition, she testified that she was not aware of people using personal email accounts for County business and that they had not bothered to include any

7

emails to and from personal email accounts in their search for relevant communications. At her third deposition, she again stated that she had not searched for personal emails relevant to the discovery request. At the court hearing, the County argued that it was unable to account for emails not on its servers, counsel had failed to send "Golden Rule" letters in accordance with local rules, and that subpoenas would be necessary as individuals' personal emails were sought as opposed to County emails. Noting that Portwood, the County's representative for the depositions, made no effort to locate personal emails despite her awareness of the issue, and the case's expedited timeline rendered strict adherence to the local rules impractical, the court issued sanctions, forbidding the County from presenting any evidence, making statements, or cross-examining witnesses during the trial. The Sheriff and Commissioner Nolte then commenced with their cases, calling Captain Siercks to testify.

After Captain Siercks testified at some length, the court reconsidered its earlier discovery ruling. The County assured the court that it could locate and produce the missing emails and other additional communications during the following week. The parties agreed to continue the trial to a later date on the belief that the remaining emails would be produced. Provided it complied with the discovery requests before the next trial date, the County would be allowed to fully participate in the proceedings.

The trial recommenced on August 19, 2019. Captain Siercks testified further, as did Captain Cathy Compton, the officer responsible for running the jail. They testified that, by the time of trial, the Sheriff no longer had the funds in his office budget necessary to pay sums currently owing on the vendor contracts for the jail's operation. Sheriff Vescovo was also called to testify concerning, among other things, the circumstances surrounding the County's otherwise unexplained decision to drastically cut his budget. He testified that in 2016 and 2017 his

operating budget was roughly $2.5 million. In 2018, his operating budget was cut to $2.1 million and in 2019 it was further cut to $1.788 million. The decision to cut his 2018 budget occurred after he began investigating a report of possible altering of official documents by county staff.

Sheriff Vescovo testified that in January of 2017, he received a report from the County Clerk that a number of official county documents, specifically financial warrants, had the signatures of the County Commissioners cut out of them. The Sheriff's investigation led him to believe that individuals in Portwood's department were involved. Concerned about a possible conflict of interest, Sheriff Vescovo decided to refer the matter to an outside agency to complete the investigation. The Missouri Highway Patrol took over the investigation, and several county employees were indicted including Portwood herself. Portwood later entered into a deferred prosecution agreement. It was after this investigation was initiated by the Sheriff that his budget was first cut.

Portwood was also called to testify. In regards to the process of creating the 2019 budget, Portwood stated that she knew that the detention line in the Sheriff's operating budget was insufficient to cover the expected costs of inmate food and healthcare at the time she prepared the proposed budget to submit to the Commission. She testified that she personally signed the contract for inmate food on or about December 7, 2018, one day after she received the Sheriff's letter informing her that the proposed budget was insufficient to cover items such as inmate food and healthcare.

Portwood also testified at length regarding text messages that she exchanged with various people which were entered into evidence. Because of redactions, it was largely unclear who she was exchanging messages with, but at various points she referred to the other party to the communications as "Commissioner," and she testified that some of the messages could have

9

been exchanged with Commissioner Ridgeway.  In one text message exchange, she was directed to organize the Sheriff's budget into the "silos" discussed above.  Another text message sent on July 18, 2019 apparently referenced Sheriff Vescovo's attempt to place the matter of his detention funding before the County Commission.  The other party texted that they "red-flagged" the Sheriff's attempt, but then noticed that Portwood and her staff were "handling it."  As to Sheriff Vescovo's June 14 request that the matter of his budget shortfall be placed before the Commission, Portwood testified that in rejecting his request, she did so on advice of counsel and did not contact the County Commissioners about it.  She also discussed how, per county ordinance, she has the authority to sign some contracts binding the County including the contracts for inmate food and healthcare.  Portwood also testified that she had a practice of meeting with Commissioner Ridgeway privately, outside of county offices, including meeting in parks.

After the close of evidence, the court took the matter under advisement.  It later issued its Findings of Fact, Conclusions of Law, and Judgment, finding for the Sheriff on Count I and issuing a writ of mandamus ordering the County to transfer various funds, stating, in pertinent part as follows:

> As to Count I of Relator's Petition for Writ of Mandamus, said Petition for Writ of Mandamus is granted  That the Clay County Commission is ordered to allocate and budget an additional $755,152.00 into Fund 279, Department 555/209 to be used by the Sheriff to satisfy the existing contracts for the food and healthcare of detainees in the Clay County Detention Center for the remainder of 2019  Additionally, the Clay County Commission is ordered to allocate and budget an additional $230,218.00 for the administrative costs into Fund 279, Department 556/209  That the Writ of Mandamus is hereby issued.

The court's findings of fact set forth much of what was discussed above.  In addition, the court found that "Chief Budget Officer Portwood's testimony was at best not credible."  The court

10

noted that the County provided absolutely no explanation for its decision to cut the Sheriff's budget, and the court specifically found that the County's actions were "arbitrary, capricious or in bad faith." The court denied the relief requested in Counts II and III. As to Count III, the court concluded that it did not have the legal authority to order the County to pay the Sheriff's legal fees.

After the court's judgment issued, the parties timely commenced this appeal. Additional facts will be set forth as needed.

## DISCUSSION

We begin our analysis by first addressing the County's one point on appeal. The County claims that the court erred in issuing its writ in that writs of mandamus may only be used to compel non-discretionary, ministerial duties. The County argues that budgeting is inherently discretionary under Missouri law, and as such, the County cannot be compelled by a writ of mandamus to budget in any particular way. The County further argues that the Sheriff has not identified a statute which gives him the right to any particular appropriation of funds. We note that the County solely argues that the circuit court erred as a matter of law. The County does not challenge the court's factual findings in any respect.

As a preliminary matter, we note that if the circuit court had ultimately *denied* permanent mandamus relief, the court's failure to issue a preliminary writ of mandamus may well have deprived this Court of appellate jurisdiction over the court's final judgment. *See*, *e.g.*, *Bartlett v. Mo. Dep't of Ins.*, 528 S.W.3d 911, 913-14 (Mo. banc 2017). However, "[w]hen a permanent writ is granted after a hearing on the merits, the aggrieved party may seek review through

appeal," even if a preliminary writ was not issued. *State ex rel. Mo. Clean Energy Dist. v. McEvoy*, 557 S.W.3d 473, 481 (Mo. App. 2018).[5]

Because no party has questioned the circuit court's factual findings, we only review the court's legal determinations. "[W]e review questions of law, including questions of statutory interpretation, *de novo*." *Chastain v. Kansas City Mo. City Clerk*, 337 S.W.3d 149, 155 (Mo. App. 2011) (citation omitted). With legal questions, we review "the trial court's determination independently, without deference to that court's conclusions." *Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. banc 2012) (citation omitted).

"The remedy of a writ of mandamus is only appropriate where a party has a clear duty to perform a certain act." *State ex rel. Scherschel v. City of Kan. City*, 470 S.W.3d 391, 397 (Mo. App. 2015) (citation omitted). "A litigant asking relief by mandamus must allege and prove that he has a clear, unequivocal, specific right to a thing claimed." *State ex rel. McKee v. Riley*, 240 S.W.3d 720, 725 (Mo. banc 2007) (citation omitted). "Whether a petitioner's right to mandamus is clearly established and presently existing is determined by examining the statute or ordinance under which petitioner claims the right." *Scherschel*, 470 S.W.3d at 397.[6]

---

[5]   We also find it significant that the reason the court decided not to enter a preliminary writ is because the County claimed that the Sheriff still had alternative administrative remedies available to him. Specifically, the County claimed that the Sheriff had not gone before the Commission to request the appropriation of additional funds. And yet, when the Sheriff did just that, after the initial hearing but before trial, the County refused to place his request on the Commission's agenda, depriving him of the alternative remedy the County claimed he could have and should have sought.

[6]   We emphasize that in this Court the County has not asserted a number of procedural objections to the Sheriff's right to mandamus relief, even though it asserted many of these objections in the trial court. These issues include: whether the Sheriff is the proper party to enforce the County's contractual obligations to the vendors who supply inmate food and health care, although he is not himself a party to the contracts; whether mandamus relief is precluded because the relevant vendors would have an adequate remedy at law through an action for breach of contract; and whether rights under a contract (as opposed to rights derived from statutes or case decisions) are enforceable through mandamus. Because the County has chosen not to address these issues here, and because these issues do not implicate the circuit court's subject-matter jurisdiction, we do not address these issues, and our opinion should not be read to implicitly decide them.

The "primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *Young v. Boone Elec. Coop.*, 462 S.W.3d 783, 791 (Mo. App. 2015) (quoting *In re Boland*, 155 S.W.3d 65, 67 (Mo. banc 2005)). "It is presumed that the General Assembly legislates with knowledge of existing laws." *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 667 (Mo. banc 2010) (citation omitted). "Under the doctrine of *in pari materia*, statutes relating to the same subject matter should be construed to achieve a harmonious interpretation." *Roesing v. Dir. of Revenue*, 573 S.W.3d 634, 639 (Mo. banc 2019) (citation omitted). We "look beyond the plain meaning of the statute *only when* the language is ambiguous or would lead to an absurd or illogical result." *Young*, 462 S.W.3d at 791 (citation omitted).

The parties rely heavily on the provisions of the County Budget Law. Mo. Rev. Stat. §§ 50.525 – 50.745 (2019). The County argues that the County Budget Law gives commissioners and the County considerable discretion in setting the Sheriff's budget. It points to § 50.540, which allows the budget officer to make changes to the proposed budget as deemed necessary. It also cites § 50.610, which allows the county commission to make additional changes as it sees fit. As to the provisions of § 50.660, relied on by the court below, the County argues that this simply sets forth the conditions under which a contract with a county is actually binding on the county. The Sheriff argues that § 50.550 mandates that the County appropriate adequate funds for the Sheriff to carry out his lawful duties, and he argues that § 50.660 requires the County to budget funds to satisfy contractual obligations, including those obligations to fund inmate food and healthcare.

13

Notwithstanding whatever budgetary discretion the commissioners may lawfully have, we first note that Missouri courts have held that mandamus can lie to compel county officials to budget for certain expenditures. In *State ex rel. Hunter v. Lippold*, we affirmed the issuance of a writ of mandamus which ordered a county to appropriate funds for a university extension program. 142 S.W.3d 241 (Mo. App. 2004). While *Hunter* acknowledged that the County Budget Law vests a county commission with "ultimate authority" over the "county's coffers," *Id.* at 245, it held that other statutory provisions nonetheless compelled the county to fund certain programs at certain levels. *See also, State ex rel. Twenty-Second Judicial Circuit v. Jones*, 823 S.W.2d 471 (Mo. banc 1992) (issuing a writ of mandamus ordering county officials to reinstate appropriations for capital improvements to a county courthouse citing statutory provisions under the County Budget Law). The County nonetheless contends that in the present case, unlike in *Hunter*, there is not a statutory provision which dictates that any particular amount must be appropriated to the Sheriff.

The overarching purpose of the County Budget Law is set forth in § 50.550.1, which states that "[t]he annual budget *shall* present a complete financial plan for the ensuing budget year." (emphasis added). Section 50.550 uses the word "shall" repeatedly. As explained in *Hunter*, the "word 'shall' is usually used to express compulsion, obligation or necessity." 142 S.W.3d at 243. Section 50.550.1 goes on to state that the budget "*shall* set forth all proposed expenditures for the administration, operation and maintenance of all offices, departments, commissions, courts and institutions…" (emphasis added). Section 50.550.2 states that the "budget *shall* contain adequate provisions for the expenditures necessary for the…salaries, office expenses and deputy and clerical hire of all county officers and agencies." (emphasis added).

14

The above provisions, and their repeated use of the word "shall," clearly mandate that the County not only adopt a budget, but that it do so with consideration of the needs of the county and its various departments including the duties of the various elected officials of the county. The language of § 50.550.2 is of particular note, in that it requires the budget to have "adequate provisions" for necessary expenditures for various officers and agencies.

The County Budget Law says nothing about what constitutes adequate provisions, and it also says little about the duties of the Sheriff's office. Missouri law does set forth his duties in other places, however. The Sheriff is charged with, among other things, being the jailer for the county, acting as the conservator of peace who commits offenders to jail, patrolling and policing county roads, providing courthouse security, and serving process. *See generally* § 221.020 and Chapter 57, respectively. Considering these provisions *in pari materia*, we thus read § 50.550 as requiring the County to adopt a budget adequately providing for those expenditures which are necessary for Sheriff Vescovo to carry out those duties prescribed by statute. In other words, the County must consider what, exactly, a department is lawfully required to do and then determine what level of funding is adequate for the department to carry out its duties.[7]

Elsewhere, the County Budget Law sets forth detailed procedures regarding how county budgets are to be adopted. Section 50.540 requires county departments to "prepare and submit to the budget officer estimates of its requirements for expenditures and its estimated revenues for

---

[7] This opinion should in no way be construed as suggesting that counties must simply accept whatever budgets are proposed by department heads as "adequate provisions." Good faith disagreements will certainly arise between county commissions and department heads regarding what is necessary for a department to carry out its lawful functions, and where good faith disagreements occur, mandamus certainly will not lie. Additionally, § 50.550's requirement that the budget present a "complete financial plan," certainly includes considering a county's anticipated revenues. Section 50.550(3) explicitly requires as much, and where a county budgets less than requested by department heads in order to balance expenditures with revenues as both prudence and the law requires, mandamus would again be inappropriate.

15

the next budget year" with comparisons to the prior budget year. It goes on to state that the budget officer, after reviewing the estimates, shall alter, revise, increase or decrease funding as deemed necessary "in view of the needs of the various spending agencies and the probable income for the year." At § 50.540.5(1) we note that in class one counties, if the budget officer recommends "any decrease or reduction" in a department's proposed budget, the budget officer "shall give special notice to the officer or agency of the decrease or reduction and the officer or agency is entitled to be heard thereon by the county commission." The County Commission, after holding public hearings regarding the proposed budget, "may revise, alter, increase or decrease the items contained in the budget and may eliminate any item or add new items." Section 50.610.

The County claims that §§ 50.540 and 50.610 in particular provide the necessary discretion for the County to budget for the Sheriff however it sees fit. However, § 50.540 limits that discretion, stating that the officer may adjust funding as deemed necessary "in view of the needs of the various spending agencies…," and it sets forth mandatory procedures which must be followed if and when the budget officer reduces a department's proposed budget. Section 50.610 does not have such limiting language, but as it is part of the larger statutory framework that is the County Budget Law, we read it as limited by the aforementioned language present in § 50.550. Section 50.550 thus imposes a duty to consider departments' necessary expenditures even where other sections appear to give the County's officers or commissioners discretion to make adjustments to the budget. Nonetheless, although we hold that the County has a duty to provide adequate funding for the Sheriff to operate his department, neither statute nor case law sets forth what amount of funding he is specifically entitled to. As such, the statutes analyzed do not

16

provide either party with a definite right or duty for any particular amount of funds to be appropriated in any particular way. Therefore, the law does not, by itself, support mandamus.

In the present case, however, certain facts do support mandamus in conjunction with the statutory framework discussed above. First, because determining what constitutes "adequate provisions" under the law is a fact-intensive and highly subjective inquiry, in most instances courts cannot, and indeed should not, endeavor to determine what amounts should be appropriated to a department-head seeking mandamus. But here, unique facts provide the court with the necessary basis to find that mandamus is necessary and arrive at the sums. Sheriff Vescovo relies on vendors who are contracted to provide various services essential to running the county jail. The Commission does not dispute that these are valid enforceable contracts entered into by the Commission. In fact, Portwood personally signed some of these vendor contracts which bound the County while the budget process was ongoing. Once the County was bound by the vendor contracts, the amount due on those contracts became the minimum sum necessary to adequately fund those lines within the Sheriff's department's budget.[8] By the time of trial, the County was in arrears on its financial obligations under the contracts administered by the Sheriff, and - because of the inadequate appropriations - there were no funds available in the Sheriff's

---

[8] The County has argued repeatedly that because the contracts at issue are term and supply contracts with indefinite amounts owed, they could not adequately budget for those contracts at the beginning of the year. And yet, the Sheriff presented prior years' figures as part of his proposed budget which showed that the 2019 budget would be insufficient. Simple math can calculate cost estimates for services such as inmate food, where a per meal price is set forth in the contract. Furthermore, the circuit court found that the contracts provided estimates of the minimum expenditures due. The County acknowledged that the number of inmates had remained consistent over the relevant period, that the vendor contracts had not changed significantly from year to year and fail to explain why they were able to budget sufficiently for these amounts in prior years but suddenly were unable to budget for these contracts at the beginning of 2019. The County's argument that the unpredictability of the contracts rendered budgeting impossible was not found credible by the trial court.

operating budget to pay these contractual obligations. The vendor contracts appropriately served as the basis for the sums of money ordered appropriated by the court below.[9]

Second, the County has provided no justification whatsoever to explain the decision to underfund the Sheriff. The cuts were not the result of overall county revenue shortfalls, quite the opposite. It was undisputed at trial that revenues have been increasing in Clay County for years, and other departments saw funding increases while the Sheriff's budget was being drastically cut. There was no argument that some unexpected or exceptional expenditures in other areas of the County's budget required cuts to be made in the Sheriff's budget. The Sheriff's budget request was based off of prior years' figures, and there was no evidence that there was a sudden jump in costs from unforeseen events such as a rising inmate population, or an increase in food or medical costs. Similarly, the County has not offered any arguments that the vendor contracts were in some form or fashion unreasonable or unnecessary. They have not argued that the services were anything but essential, or that the costs for those services were unreasonable. The inmates were not, by any account, dining on expensive meals or having unnecessary elective dental or medical procedures.

Third, the evidence established that the County knowingly underfunded the Sheriff in a manner calculated to make it impossible for the Sheriff to carry out his lawful duties for reasons that are as disturbing as they are indefensible. The Commission delegated significant authority over the Sheriff's budget to an administrator who had been investigated by the Sheriff and who had signed a deferred prosecution agreement in regards to allegations that she improperly altered

---

[9]      A small amount of the monies ordered appropriated by the court were not connected to vendor contracts, and were instead intended to fund some of the administrative overhead associated with running the county jail. As no party has questioned the propriety of these specific sums, and they make up a relatively small portion of all of the funds at issue, we do not disturb the circuit court's ruling as to those sums.

18

official County documents. The evidence overwhelmingly established that the County was distinctly aware that the Sheriff's budget was not adequate to fund the contractual obligations throughout the budgeting process. Both Portwood and Commissioner Ridgeway received letters and emails from the Sheriff's office informing them of critical funding shortfalls throughout the entire operating budget, and in particular for the jail. At the same time, Portwood was personally signing the same vendor contracts the County was refusing to fund. She even signed the contract for inmate food one day after the Sheriff sent a letter pointing out that his then proposed budget would have insufficiently funded his department, in particular the operation of the county jail in regard to the obligations contained in that same vendor contract.

While Portwood was signing vendor contracts, the County was also crafting an appropriations ordinance which arranged the Sheriff's budget into various line items that made it impossible for him to move funds around to satisfy contractual obligations, and the line item for the jail grossly underfunded the vendor contracts for food and healthcare, which the County had entered into. Text messages introduced in evidence revealed that Portwood discussed the creation of these line items with an unknown party, though in some messages she referred to the other party as "Commissioner." At the same time, the County refused to place the matter of the Sheriff's budget shortfall before the Commission, despite the law's clear requirements to do so.[10] These tactics continued into litigation, with the County first arguing that the Sheriff should have brought the matter before the Commission. We find it noteworthy that the County invoked advice of counsel when it blocked the Sheriff's access to the Commission within days of trial

---

[10]     Section 50.540.5(1), discussed *supra*, states that in class one counties, if the budget officer recommends "any decrease or reduction" in a department's proposed budget, the budget officer "shall give special notice to the officer or agency of the decrease or reduction and the officer or agency is entitled to be heard thereon by the county commission."

19

counsel's argument that administrative remedies had not been exhausted. Additionally, the County failed to comply with discovery requests throughout the proceedings below, and Portwood's testimony was found by the circuit court to be at best, not credible.

Finally, the County has made no attempt to rebut the alarming assertions made by Sheriff Vescovo, leaving us with no reason to discredit the circuit court's conclusion. He testified that his budget was first cut after he initiated an investigation into criminal conduct in the County's budget office. This investigation eventually led to criminal charges against Portwood and a deferred prosecution agreement. The circuit court's conclusion that the County's decision to cut the Sheriff's budget was retaliation against a law enforcement officer for engaging in a fruitful investigation into criminal behavior of Portwood and others is supported by the record. Despite the County's impassioned argument that these facts are irrelevant and that the law does not allow a writ to issue here, we cannot overlook facts as egregious as these.

Ultimately, to the extent the County had discretion in determining the level of expenditures necessary for the Sheriff to fulfill his statutory duties, the County exercised that discretion when it executed the vendor contracts. And yet the County appropriated less than the minimum sum necessary to fund these contracts and did so in bad faith. With Portwood having admitted that, at the time she submitted the proposed budget to the Commission she was aware that the Sheriff's budget was insufficient to meet the obligations required by the contracts, and having also provided absolutely no explanation for why this was necessary, unavoidable or even explainable, the County conceded that its budget did not provide adequate funding for the Sheriff to perform his statutory duties. Throughout this litigation the County has taken no efforts to amend its budget to provide the required funding necessary to meet the obligations of the contracts it entered into and provided no rational basis for its actions in making the cuts to the

20

Sheriff's budget or for its stubborn refusal to remedy the problems it created. The County exceeded its discretion by deliberately, unreasonably and in bad faith, providing inadequate provisions to a department. Mandamus under these unique facts was therefore appropriate.[11] Point I is denied.

We next turn to Sheriff Vescovo's point on appeal. He argues that the circuit court erred in denying his request for attorney's fees. The circuit court found that the Missouri statutes cited by the Sheriff below provide authority for the Sheriff to pay his attorney's fees from monies allocated by the County to his budget for compensating employees, and that the court lacked authority to require the County to compensate the Sheriff's attorneys beyond what was allocated by the Commission to the Sheriff for salaries. The Sheriff argues that Section 57.104 RSMo. imposes a non-discretionary duty on the County to pay the Sheriff's necessary expenditures, and that the court therefore had authority to award fees. He further argues that if we were to find that there was no statutory authority for ordering payment of attorney's fees, fees should nonetheless be awarded due to the special and unusual circumstances of this case. In addition to arguing that the court erred in not awarding fees in his brief, Sheriff Vescovo also filed a motion for attorney's fees with this Court, requesting both fees incurred below as well as his fees incurred in litigating this appeal. We will address his motion in our analysis of this point.

"Whether a trial court has authority to award attorneys' fees is a question of law which we review *de novo*." *St. Louis Title v. Talent Plus Consultants*, 414 S.W.3d 24, 26 (Mo. App. 2013). "Missouri follows the 'American Rule' which generally provides that, absent statutory

---

[11] We note that the trial court's Judgment did not order the expenditure of funds but merely ordered the County to transfer funds within the County's total budget into certain line items in the Sheriff's budget. The expenditure of those funds will be made through the normal process for payment of invoices.

21

authorization or contractual agreement, with few exceptions, each party must bear the expense of its attorney's fees." *KC Air Cargo Servs. v. City of Kansas City*, 581 S.W.3d 685, 691 (Mo. App. 2019) (citation omitted). [12]

Sheriff Vescovo first argues that a statute, § 57.104, gives the circuit court authority to award fees. Section 57.104 states, in relevant part, that the sheriff may employ an attorney, and that he "shall set the compensation for an attorney hired pursuant to this section within the allocation made by the county commission to the sheriff's department for compensation of employees to be paid out of the general revenue fund of the county." While the statute plainly allows for an attorney to be hired and paid by the sheriff, we do not read it as granting courts the authority to award fees. The statute clearly states that the sheriff "shall" set compensation for an attorney "within the allocation made by the county commission." It, therefore, empowers a sheriff to hire attorneys and pay them within the budget already provided by a county commission. The statute, however, says nothing about mandating additional appropriations to cover attorney's fees not contemplated in the original budget. Although, as Sheriff Vescovo argues, § 57.104 does not prevent a court from granting attorney's fees to a sheriff, it does not expressly authorize it either. Therefore, the statute fails to provide the necessary authority in this case.[13]

"On 'rare occasions in an equity action,' the circuit court may award attorneys' fees when it 'finds it's necessary to award the fees in order to balance the benefits.'" *Barkho v. Ready*, 523

---

[12] Often when attorney's fees are at issue in a case involving a government entity, courts must also address whether sovereign immunity has been waived. However, the County has not argued that Sheriff Vescovo failed to plead facts waiving sovereign immunity, and has not otherwise defended the claim for attorney's fees on the basis of sovereign immunity.

[13] The Sheriff's reliance on *State ex. Rel. Mennemeyer v. Lincoln County*, 553 S.W.3d 368 (Mo. App. 2018), is inapposite because in *Mennemeyer* we awarded fees under a statute completely unrelated to the case at bar.

S.W.3d 37, 46 (Mo. App. 2017) (citation omitted); *See also Goines v. Mo. Dep't of Soc. Servs.,* 364 S.W.3d 684, 688 (Mo. App. 2012) (stating: "Exceptions [to the American Rule are made] where very unusual circumstances exist so it may be said equity demands a balance of benefits.").[14] "In addition, an exception has been recognized in 'special circumstances' where a party's conduct is 'frivolous, without substantial legal grounds, reckless or punitive.'" *Goines,* 364 S.W.3d at 688 (citation omitted). A party's "intentional misconduct" has also been deemed a "special circumstance" supporting an award of fees. *Klinkerfuss v. Cronin*, 289 S.W.3d 607, 619 (Mo. App. 2009). "Special circumstances and very unusual circumstances are rare, and courts have confined these exceptions to limited fact situations." *KC Air Cargo Servs.*, 581 S.W.3d at 691 (quoting *Klinkerfuss*, 289 S.W.3d at 618).

In regards to unusual circumstances where equity demands a "balance of the benefits," this exception to the American Rule is grounded in two doctrines: the common fund doctrine and the common benefit doctrine. *Lett v. City of St. Louis*, 24 S.W.3d 157, 162-63 (Mo. App. 2000). Both doctrines address instances where a litigant secures a common benefit inured to other parties, or prevails on behalf of a class which is to be paid out of a fund. *Id.* In such instances, the party who incurred attorney's fees for prosecuting the action, may be entitled to reimbursement for such fees. *Id.* Those doctrines are clearly not applicable here, leaving us with the "special circumstances" exception.

---

[14] We note that up through the middle of the last century, writs of mandamus were not considered actions in equity. *See, e.g., State ex rel. Walton v. Miller*, 297 S.W.2d 611, 615 (Mo. App. 1956) (stating that "[m]andamus is a legal, not an equitable remedy."). The view of mandamus has since evolved, with courts and treatises now viewing it as an equitable remedy. *See, e.g., Mertens v. Hewitt Assocs.,* 508 U.S. 248, 256 (1993) (stating: "'equitable relief' can also refer to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)."); *Lexington v. Seaton*, 819 S.W.2d 753, 757 (Mo. App. 1991) (referring to a list of "equitable remedies" which includes mandamus); 52 Am Jur 2d Mandamus § 6 (stating: "A writ of mandamus is an equitable remedy…").

We cannot emphasize enough just how limited the fact situations are which support a finding of special circumstances. The seminal case on the matter, *David Ranken*, *Jr. Technical Inst. v. Boykins,* lists a variety of situations where fees were denied including instances where a defendant acted with an intent to defraud, cases of fraudulent concealment, and "when defendants tortiously conspired and threatened to wrongfully foreclose on notes and deeds of trust." 816 S.W.2d 189, 193 (Mo. banc 1991), overruled on other grounds by *Alumax Foils, Inc. v. City of St. Louis*, 939 S.W.2d 907, 911 (Mo. banc 1997). Courts have found special circumstances where a seller of real estate received payment then refused to transfer the property and refused to return the sale proceeds, *Barkho v. Ready*, 523 S.W.3d 37 (Mo. App. 2017); where a party was found to have acted on "no other reason than spite," *Ellis v. Hehner*, 448 S.W.3d 320, 326 (Mo. App. 2014); where parties transferred funds out of a corporation with the intent to "hinder, delay and defraud creditors," *Volk Constr. Co. v. Wilmescherr Drusch Roofing Co.,* 58 S.W.3d 897, 901 (Mo. App. 2001); and where a city intentionally "scared off" tenants and potential purchasers of a property by telling them zoning laws only permitted a small set of uses for a property, *Law v. City of Maryville*, 933 S.W.2d 873, 878 (Mo. App. 1996).

Recently, our Supreme Court observed that the special circumstance of "intentional misconduct" has not led it to award fees outside of a declaratory judgment context. *Trs. Of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, No. SC97349, slip op. at *34-35 (Mo. banc Aug. 13, 2019). It noted that lower court cases have awarded fees citing the special circumstance of intentional misconduct in non-declaratory judgment actions, but it stopped short of determining if this was error. *Id.*, citing, *inter alia*, *Barr v. Mo. State Dep't of Soc. Servs.,* 565 S.W.3d 683 (Mo. App. 2018) (affirming an award of fees on the grounds that the respondent failed to challenge the factual findings underlying the award). The Supreme Court further held

24

that it need not determine if the "intentional misconduct" exception should be extended to non-declaratory judgment actions as the facts in the case before it nonetheless failed to establish "special circumstances." *Trs. Of Clayton Terrace Subdivision*, slip op. at 35.

Although declaratory judgment was sought below, the court ultimately denied it, entering only the writ of mandamus. It might appear, therefore, that the matter on which the Sheriff prevailed places us in a context where the legal authority is less clear, and our own Supreme Court has recently been intentionally silent. Regardless, we are dealing with a particularly unique set of facts where a government official seeks to have another government entity pay his legal bills. Though one could characterize this case – where funds would be transferred between county coffers – as robbing Peter to pay Paul, here we are considering if Peter should pay Paul's lawyer. Despite these difficulties, the particularly unique set of facts in this case do present special circumstances giving the circuit court authority to award fees.

The circuit court found that the County's actions were "arbitrary, capricious, or in bad faith." The County knowingly underfunded the Sheriff's office, and it did so in a manner calculated to make it impossible for the Sheriff to carry out his lawful duties and stubbornly refused to take any action to remedy the problem absent litigation. The Sheriff was budgeted an insufficient sum for operation of the county jail, and his insufficient budget was appropriated in a manner that made it impossible for him to move monies around to satisfy the vendor contracts approved and entered into by the Commission. The Sheriff was faced with a dilemma where he was forced to either not pay on the contracts risking the cessation of vital services, or violate county law by moving funds between budgetary lines. Furthermore, the County refused to place this matter before the Commission to allow the matter to be resolved there. The County's willful acts left the Sheriff with no option but to litigate. This is a key distinction between this and other

25

bad faith cases where fees were not warranted. Litigation was the only remedy left for the Sheriff to employ and he did so in his official capacity.

Crucially, the County's intentionally bad behavior continued after litigation commenced. The County argued at the first hearing that the petition should be dismissed because the Sheriff was required to go before the Commission and request additional funds. It was on this basis that a preliminary writ was first denied. Within days of making this argument to the court, the County then refused to place the matter before the Commission, citing counsel's advice that matters involving pending litigation not go before the Commission. This duplicitous tactic by the County forced the Sheriff to continue litigating the matter at great expense. Discovery violations delayed hearings, dragging out the proceedings even further and increasing the Sheriff's costs of litigation, including requiring Portwood to be deposed three different times. The County's actions were in retaliation for the Sheriff investigating criminal behavior of the County's employees. The case law cited above includes fee awards where parties acted simply out of spite. Such conduct is evident here.

We would add that the nature of the dispute and the relief that was granted also supports an award of fees. The County deliberately underfunded the Sheriff in retribution as found by the trial court. If he is now forced to pay his attorney's fees from his existing budget appropriations, the County would be gifted yet another opportunity to punish the Sheriff by refusing additional appropriations to offset his legal fees in this case, and we are under no illusions as to how the County would likely respond to a request for additional appropriations. We emphasize that this alone is not dispositive, as in many cases fees unavoidably diminish a prevailing party's recovery, but it is one of several factors unique to this case which militates in favor of an attorney's fees award.

26

At the same time, we decline to award fees as to this appeal. In *Barkho v. Ready*, we affirmed an award of fees at the trial level where a party's actions in litigation were found to be "reckless, willful, malicious, and in bad faith." 523 S.W.3d at 46. However, there was no such conduct before this Court, and we therefore denied fees on appeal. *Id.* Our criticisms of the County's conduct stopped when they appeared before this body, and we found their appeal, though unsuccessful, to be an illuminating and well-argued treatment of a novel and challenging legal problem. Therefore, we deny the Sheriff's motion for attorney's fees and expenses before this court. We otherwise grant the Sheriff's point on appeal, holding that the circuit court does have authority to award attorney's fees as to the costs incurred at the trial level. Because there are no findings regarding the attorney's fees sought, and the circuit court is in a superior position to determine the reasonableness of attorney's fees, we remand this matter to the circuit court for calculation of the attorney's fees incurred at trial.

## CONCLUSION

The judgment of the circuit court granting a writ of mandamus is affirmed. We deny the Sheriff's motion for attorney's fees on appeal. We reverse, however, the judgment of the trial court as to the Sheriff's claim for attorneys' fees, and we remand for further proceedings not inconsistent with this opinion for the trial court's determination of attorney's fees incurred during the trial.

_____

Anthony Rex Gabbert, Judge

All concur.

27